UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JAMAL JOSEPH DUPERON                    CIVIL ACTION

VERSUS                                  NO. 12-487

ST. TAMMANY SHERIFF                     SECTION "H"(2)
JACK STRAIN ET AL.

## REPORT AND RECOMMENDATION

Plaintiff, Jamal Joseph Duperon, is a prisoner currently incarcerated in the St. Tammany Parish Jail in Covington, Louisiana. He filed this complaint pro se and in forma pauperis pursuant to 42 U.S.C. § 1983 against St. Tammany Parish Sheriff Rodney J. Strain, Jr., R. Demaire Inglese, M.D., Gary French, M.D. and Deputies Derek DiMartino, Rachel Webb and Carl Perilloux. Duperon alleges that while incarcerated in the St. Tammany Parish Jail, he was subjected to excessive force when and after an iron gate was slammed on his hand and denied adequate medical care for the resulting injuries. Plaintiff seeks monetary and injunctive relief. Record Doc. No. 1 (Complaint at ¶¶ IV and V).

On May 17, 2012, I conducted a telephone conference in this matter. Participating were plaintiff pro se and Ryan Davis, counsel for defendants. Plaintiff was sworn and testified for all purposes permitted by Spears v. McCotter, 766 F.2d 179 (5th Cir. 1985), and its progeny.

# THE RECORD

Duperon testified that he is serving a five-year prison sentence in the St. Tammany Parish Jail for a simple robbery conviction on August 11, 2011. Plaintiff confirmed that he asserts two claims against defendants in this case: (1) Deputy Rachel Webb slammed his hand in an iron gate, and two other deputies then exacerbated his injury by using excessive force. (2) The remaining defendants denied him adequate medical care for his hand.

Plaintiff testified that Deputy Webb slammed his hand in an iron gate on October 4, 2011, at around 5:15 or 5:20 p.m. He stated that during a routine 5:00 p.m. lockdown after the evening meal, at the same time as the deputies' shift change on that date, Deputy Webb opened the gate to the dorm to allow another prisoner, whose name Duperon did not know, to exit the gate to fetch fresh water for himself and other inmates. Duperon said that this other inmate carried several bowls with him to fill with water, one of which was for plaintiff. Duperon testified that when the other inmate returned with the filled water bowls, Deputy Webb opened the gate slightly, the other inmate struggled to pass the filled bowls through the opening and asked for help. Duperon said he then reached through the opening to grab his bowl, and Deputy Webb closed the gate on his hand.

Duperon testified that Deputy Webb was not supposed to permit the other inmate to leave the dorm area after evening lockdown, but she permitted it in this instance

because the prisoner asked for permission to fetch fresh water, and she let him out in an attempt to be nice.

Asked if he was supposed to stick his hand through the gate, Duperon said, "The gate was open . . . I was reaching to get the bowl from the other inmate." He acknowledged that he is not supposed to be through the gate after lockdown, but he was rushing to help the other inmate with the water bowls, and his "hand got caught in the gate."

Plaintiff testified that he did not know whether Deputy Webb closed the gate on his hand on purpose, but he immediately conceded that it "probably was" just an accident. Duperon said his hand was stuck in the gate for about five seconds. He testified that he "yelled out," asked Webb to open the gate, "and she opened it, but before she opened it, she turned around to see if my hand was really stuck in the gate." Plaintiff said two other guards noticed plaintiff's hand and notified Deputy Webb, at which point she opened the gate via computer command.

Duperon stated that when the gate opened, he exited the area and asked defendants Deputy Perilloux and Deputy Dimartino to see a ranking officer so he could obtain medical care. He said that Deputies Perilloux and DiMartino approached him, put his hands behind his back and "manhandled" him back into the dorm, refusing to take him for medical attention for his hand. He alleged that one of the deputies told him, "'Stop

this right now.  We gonna leave this alone. You ain't seen nothing, and I ain't seen nothing.'" Duperon said that these two officers grabbed his injured hand and placed him back in the dorm, but at that moment, the deputies' shift changed, and when new deputies came on duty Duperon again asked to be taken for medical care for his hand, and the new deputies on duty – specifically, Corporal Schoolcroft – did so.

During the <u>Spears</u> hearing, defense counsel acknowledged that a surveillance tape of the alleged incident was made and has been preserved.  I ordered that the tape be produced to me and plaintiff to be reviewed as part of the <u>Spears</u> hearing, and defendants complied. Record Doc. Nos. 27 and 28. I have reviewed the compact disc of the digital surveillance recording of the October 4th incident.

For the most part, the video depicts a view of the dorm area where  the inmates' bunk beds are located.  It shows a doorway from the dorm area into the adjacent but separate common area, or day room, but it does not clearly show the gate leading out of the day room in which Duperon said his hand was caught. Thus, the video does not show the gate-slamming portion of the incident described in Duperon's testimony.

Instead, the video shows two deputies attempting to move Duperon away from the gate that exits the day room, backwards through the day room and back into the dorm area, where most of the other inmates are walking near or lying in their bunks.  Duperon is clearly non-compliant with the deputies' efforts to move him back into the dorm area.

While the deputies do shove Duperon back toward the dorm area, they do so in response to Duperon's obvious insistence that he wants to go the other way to be let out of the day room, presumably so he can proceed to the jail's medical department, as he testified. Duperon's insistent non-compliance includes making several forceful movements and affirmative steps toward the deputies, despite their attempts to return him to the dorm area, and attempting to push past the deputies as they steer him back into the dorm area and away from the gate leading out of the day room.

The video shows the two deputies in physical contact with Duperon, who does not appear injured by the contact, for only one (1) minute and four (4) seconds, before a third deputy approaches, and Duperon is escorted out of the dorm area, forward through the day room and presumably to the medical treatment area of the jail, as he testified.

As to his medical care claim, although Duperon stated that he thought the medical records were not entirely accurate, he confirmed key portions of the records. For example, he stated that on October 4, 2011, "Nurse Ashley" (A. Livingston) examined plaintiff's hand and gave him ibuprofen, an Ace bandage, an ice pack, and one day's dose of Ultram. Plaintiff said that he was told he would see the doctor on October 5, the following day, but he only saw a nurse on that day, who gave him ibuprofen.

Duperon testified that on October 7, he saw another nurse while she was passing out medications to the inmates, and the nurse gave him more ibuprofen and altram after

Duperon showed her his hand. Plaintiff confirmed the notation in his medical records that on October 11, about a week after the incident, medical personnel from outside the jail came to the jail with an x-ray machine and x-rayed his hand. Duperon confirmed the notation in the medical record signed by defendant Dr. Inglese, the jail's medical director, indicating that the doctor examined the x-ray and concluded that no bones in plaintiff's hands or fingers were broken.

Duperon testified that after Dr. Inglese examined the x-ray, he received no further medication, but his hand was still in pain, so he continued making complaints and asking for medical attention, but he received no response. He stated that on October 16, 2011, he struck another inmate in what Duperon described as "a little simple fight." He testified that during the fight he was hit by the other inmate, and the area around his eye became swollen. Duperon acknowledged that he is right-handed, that it was his right hand that had become stuck in the gate during the incident on which he bases this claim, and that during the fight he "most likely" struck the other inmate with his right hand. Duperon testified that after the fight, he refused medical attention when prison officials asked him if there was anything wrong with him, "and I told them, 'no sir.'" He said nothing was wrong with him at that time.

Duperon confirmed the reference in his medical records that a few days later, Nurse R. Mendenhall examined plaintiff's right hand in response to his sick-call request

about a lump on his hand.  He testified that on October 28, he was taken to see Dr. Inglese, who examined his hand and had him "rushed"  to Lallie Kemp Hospital in Independence, Louisiana.  Duperon confirmed the indications in his medical records that he had suffered a fracture in his right hand. He testified that at the hospital his hand was set in a splint and wrapped in an Ace bandage, but he was told that the x-ray at the hospital showed that his hand was not broken.  Plaintiff said he was told that the knot on his hand was due to shifting ligaments, and he was scheduled for an appointment for orthopedic surgery. Although the medical records indicate a fracture to his hand, Duperon testified that the doctor at the hospital told him the hand was not fractured. Duperon said he still has a lump on his hand and that he wore the splint given to him at the hospital for a month-and-a-half to two months, until the splint was removed around December 7, 2011, when he had orthopedic surgery at Louisiana State University State Hospital in New Orleans.  He testified that medical staff at the hospital removed the splint, found "dislocation of a joint," ordered a CT scan and additional pain medicine. He said that when he returned to the jail, he was assigned to the medical tier, but he did not have a CT scan and was not given more medicine and was then placed back in the dorm.

Duperon testified that he continued to have pain and a lump in his hand. He stated that he did not return to the doctor or receive any additional pain medication for his hand

until around February 17, 2012, when he jammed his fingers while playing basketball. He stated that at that time a doctor in the jail gave him motrin and an Ace bandage.

Duperon confirmed the reference in his medical records that on February 23, 2012, he was again transported to the clinic at University Hospital where he received a CT scan on his injured right hand. Plaintiff said that he never received the results of the CT scan, but his medical records show that plaintiff had suffered a "remote fracture," the chronology of which was "indeterminate," and even "in retrospect" the fracture was not evident in images from December 7, 2011, or early February 2012; thus indicating that he had broken his finger playing basketball.

On cross-examination, plaintiff clarified that it was the top of his right hand near his thumb that had been caught in the gate during the subject incident.

## ANALYSIS

I.     STANDARDS OF REVIEW

"A federal court may dismiss a claim in forma pauperis 'if satisfied that the action is frivolous or malicious.'" Moore v. McDonald, 30 F.3d 616, 620 (5th Cir. 1994) (quoting former 28 U.S.C. § 1915(d), now incorporated in 28 U.S.C. § 1915(e), as amended). A complaint is frivolous "if it lacks an arguable basis in law or fact." Davis v. Scott, 157 F.3d 1003, 1005 (5th Cir. 1998); Reeves v. Collins, 27 F.3d 174, 176 (5th Cir. 1994). The law "'accords judges not only the authority to dismiss a claim based on

an indisputably meritless legal theory, but also the unusual power to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual contentions are clearly baseless.'" <u>Macias v. Raul A. (Unknown), Badge No. 153</u>, 23 F.3d 94, 97 (5th Cir. 1994) (quoting <u>Neitzke v. Williams</u>, 490 U.S. 319, 327 (1989)).

The purpose of a <u>Spears</u> hearing is to dig beneath the conclusional allegations of a pro se complaint, to ascertain exactly what the prisoner alleges occurred and the legal basis of the claims. <u>Spears</u>, 766 F.2d at 180. "[T]he <u>Spears</u> procedure affords the plaintiff an opportunity to verbalize his complaints, in a manner of communication more comfortable to many prisoners." <u>Davis</u>, 157 F.3d at 1005. The information elicited at such an evidentiary hearing is in the nature of an amended complaint or a more definite statement under Fed. R. Civ. P. 12(e). <u>Wilson v. Barrientos</u>, 926 F.2d 480, 481 (5th Cir. 1991); <u>Adams v. Hansen</u>, 906 F.2d 192, 194 (5th Cir. 1990). "Upon development of the actual nature of the complaint, it may also appear that no justiciable basis for a federal claim exists." <u>Spears</u>, 766 F.2d at 182.

The court may make only limited credibility determinations in a <u>Spears</u> hearing, <u>Norton v. Dimazana</u>, 122 F.3d 286, 292 (5th Cir. 1997) (citing <u>Cay v. Estelle</u>, 789 F.2d 318, 326-27 (5th Cir. 1986), <u>overruled on other grounds by Denton v. Hernandez</u>, 504 U.S. 25, 112 S.Ct. 1728 (1992)), and may consider and rely upon documents as additional evidence, as long as they are properly identified, authentic and reliable. "The

Court should allow proper cross-examination and should require that the parties properly identify and authenticate documents. A defendant may not use medical records to refute a plaintiff's testimony at a <u>Spears</u> hearing." <u>Id.</u> (citing <u>Wilson</u>, 926 F.2d at 482-83; <u>Williams v. Luna</u>, 909 F.2d 121, 124 (5th Cir. 1990)). However, "'[m]edical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference.'" <u>Gobert v. Caldwell</u>, 463 F.3d 339, 347 n.24 (5th Cir. 2006) (quoting <u>Banuelos v. McFarland</u>, 41 F.3d 232, 235 (5th Cir. 1995)) (internal citations omitted).

After a <u>Spears</u> hearing, the complaint may be dismissed as legally frivolous if it lacks an arguable basis in law, <u>Jackson v. Vannoy</u>, 49 F.3d 175, 176-77 (5th Cir. 1995); <u>Moore v. Mabus</u>, 976 F.2d 268, 269 (5th Cir. 1992), or "as factually frivolous only if the facts alleged are 'clearly baseless,' . . . [or] when the facts alleged rise to the level of the irrational or wholly incredible." <u>Id.</u> at 270.

"'A complaint lacks an arguable basis in law if it is based on an indisputably meritless legal theory, such as if the complaint alleges the violation of a legal interest which clearly does not exist.'" <u>Davis</u>, 157 F.3d at 1005 (quoting <u>McCormick v. Stalder</u>, 105 F.3d 1059, 1061 (5th Cir. 1997)). "When a complaint raises an arguable question of law which the district court ultimately finds is correctly resolved against the plaintiff, dismissal under Rule 12(b)(6) is appropriate; however, dismissal under the section

1915(d) standard is not." <u>Moore</u>, 976 F.2d at 269. A prisoner's in forma pauperis complaint which fails to state a claim may be dismissed sua sponte at any time under 28 U.S.C. § 1915(e)(2) and 42 U.S.C. § 1997e(c)(1).

In this case, plaintiff's complaint may be dismissed under 28 U.S.C. § 1915(e) and 42 U.S.C. § 1997e(c)(1), either as frivolous because it lacks an arguable basis in law or under Rule 12(b)(6) in light of his testimony explaining the factual basis of his claims. Plaintiff's complaint, as amended by his testimony at the <u>Spears</u> hearing, fails to state a claim under the broadest reading.[1]

## I.    <u>EXCESSIVE FORCE</u>

Duperon was a convicted prisoner at the time of the incident about which he complains when his hand was caught in the gate by Deputy Webb and he was subsequently "manhandled" by Deputies DiMartino and Perilloux. Construing plaintiff's allegations extremely broadly, it appears that he attempts to state a claim for excessive force under the Eighth Amendment against all three deputies. In both of these respects, Duperon fails to state a cognizable claim under Section 1983 against any of the deputies.

In the context of an inmate's allegations that a prison guard had violated the Eighth Amendment by using excessive force against the plaintiff, the United States

---

[1] Pro se civil rights complaints must be broadly construed, <u>Moore</u>, 30 F.3d at 620, and I have broadly construed the complaint in this case.

Supreme Court "has held that 'the use of excessive physical force against a prisoner may constitute cruel and unusual punishment [even] when the inmate does not suffer serious injury.'" Wilkins v. Gaddy, 130 S. Ct. 1175, 1176 (2010) (quoting Hudson v. McMillian, 503 U.S. 1, 4 (1992)). The Supreme Court confirmed that the standards it had established in Hudson remain the law.

> The "core judicial inquiry," we held [in Hudson], was not whether a certain quantum of injury was sustained, but rather "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." 503 U.S. at 7, 112 S. Ct. 995; see also Whitley v. Albers, 475 U.S. 312, 319-321, 106 S. Ct. 1078, 89 L.Ed.2d 251 (1986). "When prison officials maliciously and sadistically use force to cause harm," the Court recognized, "contemporary standards of decency always are violated . . . whether or not significant injury is evident. . . ." Hudson, 503 U.S. at 9 . . . .
> As we stated in Hudson, not "every malevolent touch by a prison guard gives rise to a federal cause of action." 503 U.S. at 9, 112 S. Ct. 995. "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Ibid. (some internal quotation marks omitted). An inmate who complains of a "push or shove" that causes no discernible injury almost certainly fails to state a valid excessive force claim. Ibid. (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)).

Id. at 1178.

Even if Deputy Webb's closing of the gate on plaintiff's hand could be characterized as a forceful reaction to Duperon's prohibited movement of his hand through the open gate after evening lockdown, it is clear from plaintiff's testimony that he was subjected to a minor, one-time use of minimal force, both by Deputy Webb and

the two deputies who responded. The deputies' conduct in closing the gate and then moving Duperon back into the dorm area before taking him for medical treatment happened suddenly, was very brief and caused extremely minor physical injuries. As the Supreme Court held in <u>Wilkins</u>, the "extent of injury suffered by an inmate is one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation. . . . The extent of injury may also provide some indication of the amount of force applied." <u>Wilkins</u>, 130 S. Ct. at 1178. Plaintiff's testimony describing the incident <u>and</u> the surveillance video that recorded it suggest that the force applied in closing the gate and then escorting Duperon back into the dorm was de minimis and not of constitutional magnitude. The hand injuries that were ultimately diagnosed more likely occurred or were exacerbated by his subsequent fight with another inmate in which he used the same hand to strike his opponent or in the subsequent basketball game in which he used the same hand for ball playing.

Most significantly, Duperon's testimony and the surveillance video fail to demonstrate that any force "was carried out maliciously and sadistically rather than as part of a good-faith effort to maintain or restore discipline." <u>Wilkins</u>, 130 S. Ct. at 1180 (quotations omitted). Plaintiff testified that Deputy Webb's action in closing the gate on his hand "probably was" an accident. He conceded that she opened the gate, releasing his hand, as soon as she realized it had been caught. Thus, Deputy Webb's actions were

at most an unwise or negligent lapse in jail protocol in permitting the inmates to fetch water after lockdown, rather than malicious or sadistic action meant to cause harm. Similarly, the surveillance video establishes that Duperon's alleged "manhandling" by Deputies Perilloux and DiMartino was <u>not</u> constitutionally excessive force, but instead was appropriate and minimal force employed in an attempt to maintain jailhouse order and security, rather than a malicious or sadistic attempt to injure.

Under these circumstances, to the extent, if any, that plaintiff asserts a claim for injuries concerning his injured hand, he at best asserts a negligence claim, not an excessive force claim of civil rights violations cognizable under Section 1983. Duperon at best states a claim under state tort law that the deputies were negligent. Claims arising from allegedly negligent acts do not give rise to relief under Section 1983.

The Supreme Court has held that "the Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss or injury to life, liberty or property." <u>Daniels v. Williams</u>, 474 U.S. 327, 328 (1986); <u>Davidson v. Cannon</u>, 474 U.S. 344, 347 (1986). In a number of contexts, other courts have determined that allegations amounting to negligence cannot support a Section 1983 claim. <u>Mendoza v. Lynaugh</u>, 989 F.2d 191, 195 (5th Cir. 1993) (negligent medical care); <u>Hare v. City of Corinth</u>, 74 F.3d 633, 641-42, 646 (5th Cir. 1996) (negligence insufficient to support failure to protect claim under Section 1983); <u>Eason v. Thaler</u>, 73 F.3d 1322, 1328-29 (5th

Cir. 1996) (negligence cannot support Section 1983 action for deprivation of religious rights or for an Eighth Amendment claim based upon prison officials' alleged gross negligence in permitting a gas leak to occur); Doe v. Taylor Indep. Sch. Dist., 975 F.2d 137, 142 (5th Cir. 1992), vacated on other grounds, 15 F.3d 443 (5th Cir. 1994) ("Even when constitutional liberty interests are implicated, not all bodily injuries caused by state actors give rise to a constitutional tort, for it is well settled that mere negligence does not constitute a deprivation of due process under the Constitution.").

Prison officials therefore cannot be liable under Section 1983 for the injuries, if any, resulting from the incident in which Duperon's hand became caught in the closing gate, and he was then pushed back into the prison dorm. This claim must be dismissed as legally frivolous and for failure to state a claim under Section 1983. In the absence of a viable pendent federal claim, if Duperon wants to pursue negligence claims under state law, he may do so only in state court.

III.    MEDICAL CARE

Duperon testified that he was a convicted prisoner at all times during which defendants allegedly failed to provide him with adequate medical care. In Estelle v. Gamble, 429 U.S. 97, 104 (1976), the Supreme Court held that a convicted prisoner may succeed on a claim for damages under 42 U.S.C. § 1983 for inadequate medical care only if he demonstrates that there has been "deliberate indifference to serious medical needs"

by prison officials or other state actors. Only deliberate indifference, "an unnecessary and wanton infliction of pain . . . or acts repugnant to the conscience of mankind," constitutes conduct proscribed by the Eighth Amendment.  Id. at 105-06; accord Gregg v. Georgia, 428 U.S. 153, 182-83 (1976).

"Deliberate indifference" means that a prison official is liable "only if he knows that the inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."  Farmer v. Brennan, 511 U.S. 825,  847 (1994).

An inmate must satisfy two requirements to demonstrate that a prison official has violated the Eighth Amendment.  "First, the deprivation alleged must be, objectively, 'sufficiently serious'; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities."  Id. at 834 (quotation omitted).

Further, the plaintiff must establish that the defendant possessed a culpable state of mind.  Id. (citing Wilson v. Seiter, 501 U.S. 294, 298 (1991)).  A prison official cannot be held liable "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Id. at 837.  "Mere negligence or a failure to act reasonably is not enough. The officer must have the subjective intent to cause harm."  Mace v. City of Palestine,

333 F.3d 621, 626 (5th Cir. 2003). If the court finds that one of the components of the test is not met, it need not address the other component. Davis, 157 F.3d at 1005.

> The Supreme Court has recently reaffirmed that "deliberate indifference" is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action. Board of the County Commissioners of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 117 S. Ct. 1382, 1391 (1997). The deliberate indifference standard permits courts to separate omissions that "amount to an intentional choice" from those that are merely "unintentionally negligent oversight[s]."

Southard v. Texas Bd. of Crim. Justice, 114 F.3d 539, 551 (5th Cir. 1997) (additional citations omitted) (emphasis added). "'Subjective recklessness,' as used in the criminal law, is the appropriate test for deliberate indifference." Norton, 122 F.3d at 291.

In this case, Duperon's allegations negate any inference that defendants acted with deliberate indifference. Although a hand fracture may present a serious medial need, Duperon's testimony and the verified medical records establish that jail personnel were not deliberately indifferent to his medical condition in the constitutional sense. Duperon has alleged facts, confirmed by his testimony and his medical records, that negate any inference of deliberate indifference by jail officials.

Duperon was seen by nurses and doctors concerning the condition of his hand on numerous occasions. He was provided with medication, Ace bandages, x-ray examination and ultimately a CT scan. When his condition worsened after he injured the same hand, first in a fight with another inmate and later while playing basketball, he was

transported from the jail to two different hospitals, one for emergency treatment and the other for specialized orthopedic care.

Under these circumstances, it cannot be inferred that jail personnel were deliberately indifferent in any way to plaintiff's condition. While it is clear from his allegations and testimony that Duperon is not satisfied with the speed or nature of his medical care, and that he experienced some delay in his initial treatment, no finding of deliberate indifference can be made based on this record.

> [T]he decision whether to provide additional treatment is a classic example of a matter for <u>medical judgment</u>. A showing of deliberate indifference requires the prisoner to submit evidence that prison officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs. Deliberate indifference is an extremely high standard to meet.

<u>Gobert</u>, 463 F.3d at 346 (footnotes, citations and internal quotations omitted) (emphasis added). No such showing has been made on the current record. In Duperon's case, the decision initially to prescribe medication and an Ace bandage rather than more specialized care was a classic example of the exercise of "medical judgment," which, even if incorrect, cannot serve as the basis for a finding of deliberate indifference in the constitutional sense.

Mere delay in receiving care is not in and of itself a constitutional violation. <u>Easter v. Powell</u>, 467 F.3d 459, 463 (5th Cir. 2006); <u>Mendoza v. Lynaugh</u>, 989 F.2d 191,

195 (5th Cir. 1993); <u>Wesson v. Oglesby</u>, 910 F.2d 278, 284 (5th Cir. 1990).  Regardless of the length of delay, plaintiff at a minimum must show deliberate indifference to serious medical needs.  <u>Wilson</u>, 501 U.S. at 298.  No such showing can be made in this case in light of the continuing medical attention Duperon has received for his hand during his incarceration.

Contentions like Duperon's that amount to a disagreement with the speed, quality or extent of medical treatment or even negligence do not give rise to a Section 1983 claim.  Even any alleged misdiagnosis of his hand injury as to whether or not it presented a fracture, stretched ligaments or anything more serious than was first diagnosed, cannot constitute a constitutional violation under these circumstances.  "[A]lthough inadequate medical treatment may, at a certain point, rise to the level of a constitutional violation, malpractice or negligent care does not."  <u>Stewart v. Murphy</u>, 174 F.3d 530, 534 (5th Cir. 1999) (citation omitted); <u>see id.</u> (active treatment of prisoner's serious medical condition that ultimately resulted in death does <u>not</u> constitute deliberate indifference, even if treatment was negligently administered); <u>see Rowe v. Norris</u>, 198 F. App'x 579, 581 (8th Cir. 2006) (no constitutional violation when inmate disagreed with physician's choice of medication); <u>see also</u> <u>Estelle</u>, 429 U.S. at 107 (The "question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment.  A medical decision not to order an X-ray, or like

measures, does not represent cruel and unusual punishment.  At most it is medical malpractice . . . ."); Corte v. Schaffer, 24 F.3d 237, 1994 WL 242793, at *1 (5th Cir. 1994)) (Contrary to plaintiff's allegation that he had received "no treatment" because he believed he needed a referral to a gastroenterologist, he failed to demonstrate deliberate indifference when he was seen by prison medical personnel more than 100 times and received numerous gastrointestinal tests and a chest x-ray, with all results being within a normal range.); Marksberry v. O'Dea, 173 F.3d 855, 1999 WL 98533, at *2 (6th Cir. Jan. 28, 1999) (plaintiff who alleged inadequate treatment for broken hand failed to state constitutional violation, when he was examined by physician and received x-rays and medication); Mendoza, 989 F.2d at 193 (prisoner's disagreement with the type or timing of medical services provided cannot support a Section 1983 claim); Varnado v. Lynaugh, 920 F.2d 320, 321 (5th Cir. 1991) (plaintiff, who was 18 months post-surgical implantation of hip prosthesis, who complained of pain in his hip and who was ultimately diagnosed with broken wires in the prosthesis, failed to state a claim for deliberate indifference when he was seen by medical personnel "numerous times for problems relating to his hip."); Wesson, 910 F.2d at 284 (allegations establishing provision of medical treatment are inconsistent with inference of deliberate indifference).

Plaintiff's complaints in this case about his medical care for his injured hand fail to state a claim of violation of his constitutional rights sufficient to obtain relief under

Section 1983 because he cannot establish "deliberate indifference" under the applicable constitutional standard.  This claim must therefore be dismissed.

## RECOMMENDATION

For all of the foregoing reasons, it is **RECOMMENDED** that plaintiff's complaint be **DISMISSED WITH PREJUDICE** as legally frivolous and/or for failure to state a claim under 28 U.S.C. § 1915(e)(2) and 42 U.S.C. § 1997e(c)(1).

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[2]

New Orleans, Louisiana, this ____18th____ day of July, 2012.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[2]Douglass referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.